Quarracy L. Smith Bar No. 033515
James M. Green AZ Bar No. 032211
**Smith & Green, Attorneys at Law, PLLC**
3101 North Central Avenue, Suite 700
Phoenix, AZ 85012
Telephone: (602) 812-4600
Fax: (888) 913-2345
Email: qsmith@smithgreenlaw.com
*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sarah Cohen, | Case No.: |
| Plaintiff, | |
| vs | **COMPLAINT** |
| City Of Phoenix, a Public Entity; City Of Phoenix Police Department, a Public Entity; Chief Michael Sullivan, in his Official and Individual Capacity; Officer Annette Hannah, in his Official and Individual Capacity; Officer Dillon Yakshe, in his Official and Individual Capacity; Officer Vincent Aviles, in his Official and Individual Capacity; Officer Elena Vasquez Hernandez, in his Official and Individual Capacity; and John Doe Officers 1-20, | (Jury Trial Demanded) |
| Defendants. | |

**INTRODUCTION**

This civil-rights and tort action arises from the unlawful, excessive, and unconstitutional use of force by officers of the Phoenix Police Department ("PPD") against Plaintiff Sarah Cohen, a vulnerable adult living with schizophrenia and dissociative identity disorder ("DID").

On November 9, 2024, at approximately 3:30 p.m., multiple PPD officers responded to a 911 call of alleged disorderly conduct at Plaintiff's mother's apartment complex. Within minutes, despite Plaintiff's calm, seated posture and compliance with commands, officers escalated the encounter into a brutal assault: they fired five 40mm 'less-lethal' sandbag rounds, tased her, and then shot her in the abdomen with a live service-weapon round.

The live round tore through Plaintiff's stomach, colon, and valve, necessitating emergency surgeries (including laparotomy, bowel resection, and partial gastrectomy) and leaving permanent injuries, disfigurement, disability, and emotional trauma.

Plaintiff seeks compensatory and punitive damages, as well as injunctive and declaratory relief, under 42 U.S.C. § 1983; the Fourth and Fourteenth Amendments; Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and Arizona law.

**PARTIES, JURISDICTION, AND VENUE**

1.  Plaintiff Sarah Cohen ("Plaintiff" or "Ms. Cohen") is, and at all relevant times was, a resident of Maricopa County, Arizona. She is a vulnerable adult within the meaning of A.R.S. § 46-451 et seq. She has no appointed guardian.

2.  Defendant City of Phoenix is a municipal corporation and public entity organized under the laws of Arizona and operating the Phoenix Police Department in Maricopa County, Arizona.

3.  Defendant Phoenix Police Department is a public entity and a department of the City of Phoenix. At all relevant times, PPD was responsible for the policies, practices, customs, training, supervision, and discipline of its officers.

4.  Defendant Michael Sullivan is, and at all relevant times was, the Chief (or Acting/Interim Chief) of PPD. He is sued in his official and individual capacities.

5.  Defendants Annette Hannah, Dillon Yakshe, Vincent Aviles, and Elena Vasquez Hernandez were, at all relevant times, sworn PPD officers acting under color of state law and within the course and scope of their employment with the City of Phoenix. Each is sued in his or her individual and official capacities. John Doe Officers 1–20 are PPD officers whose identities are presently unknown.

6.  This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, and supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367(a).

7. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims occurred in this District and Defendants reside and/or are found here.

8. Plaintiff provided a timely Notice of Claim pursuant to A.R.S. § 12-821.01 on or about April 9, 2025.

### PLAINTIFF'S BACKGROUND, DISABILITY, AND VULNERABLE-ADULT STATUS

9. Plaintiff is diagnosed with schizophrenia and dissociative identity disorder ("DID").

10. Plaintiff's DID stems from severe sexual trauma: she was sexually molested by her step-grandfather beginning at approximately age five; and, at approximately 18½ years old, she was sexually assaulted by a father and his son (as later reported by her sister, Destiny).

11. Between 2012 and 2014, Plaintiff disclosed to her mother the presence of multiple identities ("personas")—two or three male personas and four or five female personas—consistent with DID.

12. At all relevant times, Plaintiff was under active psychiatric care, consistently taking prescribed medications, and—by late 2024—was on a monthly antipsychotic injection through her ACT (Assertive Community Treatment) Team. The ACT Team petitioned for services and medication management around the time of the incident.

13. Given her clinical conditions and trauma history, Plaintiff is a "vulnerable adult" under A.R.S. § 46-451 et seq., and Defendants knew or reasonably should have known of Plaintiff's disability and vulnerability during their encounter with her on November 9, 2024.

4

## FACTUAL ALLEGATIONS

14. On November 9, 2024, at approximately 3:30 p.m., Plaintiff was outside her mother's apartment at 3432 N. 12th Place, Phoenix, Arizona 85014.

15. She had been calmly seated atop stone steps, intermittently using her phone.

16. A neighbor called 911 reporting alleged disorderly conduct, stating that Plaintiff had been knocking or banging on the door.

17. Plaintiff's mother knew Plaintiff was outside but was attempting to teach boundaries about acceptable behavior by not immediately letting her in.

18. It is believed Plaintiff possessed a butter knife—an item consistent with kitchenware—while outside.

19. When officers later arrived and commanded Plaintiff to put the "knife" down, Plaintiff placed the butter knife in her pocket.

20. Multiple officers—ultimately approximately thirty—responded, including Defendants Hannah, Yakshe, Aviles, and Vasquez Hernandez.

21. Body-worn cameras captured much of the encounter; portions of video later aired on local outlets (News 10 and News 15).

22. Upon arrival, officers yelled at Plaintiff with overlapping and contradictory commands, including to raise her hands, to drop the knife (already pocketed), and to submit to arrest.

23. Officers used profanity and spoke in a manner that escalated, rather than defused, the situation.

24. Plaintiff raised her hands, one at a time, while seated. One hand had been in her pocket to secure the butter knife; she then raised the other hand, maintaining a seated, non-threatening posture at the top of the stairs.

25. Without allowing meaningful time to comply and despite Plaintiff's calm posture, officers began firing 40mm 'less-lethal' sandbag rounds.

26. Defendant Yakshe discharged the launcher multiple times, ultimately striking Plaintiff five times.

27. Plaintiff cried out in pain, repeatedly telling officers she was bleeding and hurt. She remained seated, intermittently shielding herself within the doorway and on the stone steps.

28. Officers continued to shout inconsistent commands in a chaotic manner.

29. When Plaintiff attempted to descend the steps—with both hands on the stair rail for balance—Defendant Hannah fired a live service-weapon round into Plaintiff's abdomen, despite her visible injury, crying, and non-threatening demeanor.

30. Defendants Aviles and Vasquez Hernandez then tased Plaintiff as she fell/rolled down the stairs, causing additional injury and further loss of control of her body.

31. Officers immediately handcuffed Plaintiff while she lay bleeding.

32. Plaintiff sustained catastrophic internal injuries.

33. Emergency medical services transported her to Banner University Medical Center, where she underwent multiple life-saving procedures, including laparotomy, bowel resection, and partial gastrectomy. She required additional left-leg wound debridements and faces future plastic-surgery repairs.

34. Plaintiff remained hospitalized until mid-December 2024. Criminal charges initially filed against Plaintiff were dismissed while she was at Banner.

35. Following the shooting, officers searched Plaintiff's mother's apartment.

36. Plaintiff's mother was removed and detained in a police vehicle for approximately six hours—from around 3:30 p.m. until about 9:30 p.m.—and was not allowed to re-enter until the "crime scene" was cleared.

37. The knife logged in police reports did not match the butter knife shown in news video and known to Plaintiff's family.

38. When questioned, officers could not reconcile the discrepancy.

39. As a direct result of the shooting and aftermath, Plaintiff lost housing, was deemed a trespasser, and was evicted from the apartment. She and her mother have been forced to live in a hotel.

40. Plaintiff continues to experience severe pain, disability, emotional trauma, and economic loss.

41. At no point did Plaintiff make a threatening lunge, charge, or stab at any officer or third party.

42. She was seated, crying, bleeding, and compliant with key commands (including putting the butter knife away in her pocket and raising her hands).

43. At all times, the situation could have been safely managed through accepted crisis-intervention tactics—time, distance, cover, calm communication, and engaging

mental-health resources—rather than by escalating to impact munitions, CEW deployment, and lethal gunfire.

## THE CITY OF PHOENIX'S POLICIES, PRACTICES, CUSTOMS, AND HISTORY OF MISCONDUCT (MONELL ALLEGATIONS)

44.    In order to properly establish the basis for the claims asserted herein, it is necessary to set forth the longstanding history of the Phoenix Police Department ("PPD"), and its agents, systemic and unlawful reliance on excessive force and deadly force against the citizens of Phoenix, Arizona.

45.    This pervasive pattern of brutality has been overseen, sanctioned, and sustained by the City of Phoenix itself, which has chosen to cultivate and perpetuate a police force known for violence rather than restraint.

46.    For decades, the City of Phoenix has implemented and tolerated policies, procedures, and customs that have produced a department whose officers repeatedly act with wanton disregard for the sanctity of human life and the constitutional rights of those they are sworn to protect.

47.    The result has been an entrenched culture of aggression, escalation, and unjustifiable deadly force.

**History of the Phoenix Police Department's Use of Excessive and Deadly Force**

48.    PPD is the largest policing agency in Arizona, and with that size has come an equally large and well-documented legacy of unlawful, excessive, and deadly force.

49.     This pattern is not anecdotal but systemic. PPD officers' unlawful use of deadly force has significantly increased in recent years, particularly since 2018, with Phoenix consistently ranking among—if not at—the very top of American cities for officer-involved shootings and fatal encounters.

50.     In 2018 alone, Phoenix recorded an unprecedented forty-four officer-involved shootings, half of which were fatal.

51.     That number dwarfs other metropolitan police agencies, placing Phoenix as the most violent in the nation in terms of deadly police force.

52.     Despite these alarming figures, the City of Phoenix continues to claim that PPD officers are bound by "Operations Orders" that direct officers to use de-escalation techniques and less-lethal measures before ever resorting to deadly force.

53.     Those written policies, however, have proven to be empty words. In practice, officers consistently bypass de-escalation and non-lethal tools, jumping directly to the use of impact rounds, tasers, and firearms, even when the subject poses no imminent threat of serious harm.

54.     Although PPD purports to provide officers with less-lethal options such as chemical agents, restraints, and electronic control devices, the actual practice demonstrates the opposite: officers regularly employ "less-lethal" rounds in excessive numbers and transition without pause to tasers and live ammunition. Instead of preventing escalation, these tools are misused to justify and accelerate the path to deadly force.

55.    The statistics are staggering. After the 2018 spike, Phoenix averaged twenty-five officer-involved shootings per year between 2018 and 2022, compared to twenty-one per year in the decade prior. In 2018, PPD officers killed twenty-two people; in 2019, they killed fifteen; in 2020, eleven; in 2021, seven; and in 2022, ten. These numbers reveal a relentless and unabated reliance on deadly force.

56.    In response, the U.S. Department of Justice announced a formal investigation into PPD in August 2021.

57.    Among its preliminary findings, the DOJ highlighted Phoenix's excessive reliance on deadly force and urged the Department to adopt genuine de-escalation practices.

58.    Yet, despite federal scrutiny, PPD has failed to change course. Officer-involved shootings and excessive force incidents continued unabated through 2021, 2022, and into 2023.

59.    The City's leadership has repeatedly promised reform through "new policies" and "improved training," but these measures have been illusory.

60.    Under former Chief Jeri Williams and continuing under Defendant Chief Michael Sullivan, claims of reform have consistently been followed by fresh tragedies. Indeed, within one week of Chief Sullivan's announcement of a de-escalation plan in November 2022, PPD officers shot two more people, killing one of them.

61.    This failure of leadership has left more than 400 Phoenix police officers without proper training on the very "less-lethal" tools the Department claims are designed

10

to prevent deadly outcomes.

62.     The result is predictable: a police force that defaults to escalation and deadly force, regardless of circumstance.

63.     The City of Phoenix continues to knowingly authorize and defend policies and procedures that generate needless killings and maimings. This reckless management has created a Department where officers operate with extreme indifference to human life, routinely using excessive and deadly force where restraint and care are required.

64.     The lack of transparency compounds the problem. Defendant Sullivan, like his predecessors, has failed to promptly release unedited body camera footage in officer-involved shootings, shielding officers from accountability and deepening the community's mistrust.

65.     Families of those killed or injured—including Sarah Cohen—are denied truth and justice while the cycle of violence continues.

66.     These systemic failures have resulted in an ever-growing number of lawsuits alleging excessive force, wrongful death, and unconstitutional policing.

67.     Each new incident, rather than being an aberration, is evidence of an entrenched and unlawful culture of excessive and deadly force within PPD.

68.     Sarah Cohen's case is not an outlier—it is the inevitable product of this pattern. The same unconstitutional culture that produced dozens of unnecessary shootings also produced the November 9, 2024 assault against Sarah.

69.     Officers who should have de-escalated instead escalated. Officers who should have protected life instead used excessive impact munitions, tasers, and ultimately a service weapon against a mentally ill, unarmed woman who posed no immediate threat.

70.     Sarah's survival does not negate the lethal intent or unconstitutional force applied against her.

71.     Her case demonstrates with painful clarity how Phoenix's history of excessive and deadly force continues to victimize vulnerable citizens, confirming that her near-fatal shooting was not an isolated tragedy but the foreseeable result of systemic misconduct.

## CLAIMS FOR RELIEF

### CAUSE OF ACTION I:

**42 U.S.C § 1983: (Fourth & Fourteenth Amendments - Excessive Force)**
**Against Defendant Hannah and Defendant Yakshe**

72. Plaintiff incorporates by reference all previous allegations as fully set forth herein.

73. 42 U.S.C. § 1983 provides individuals with a cause of action to sue for violations of their constitutional rights.

74. Defendant Hannah and Defendant Yakshe acted willfully, knowingly, and with specific intent to deprive Ms. Cohen of her rights secured by the Fourth Amendment to the United States Constitution, including her right to be secure in her person and free from the use of unreasonable force and seizure.

75. Hannah and Yakshe acted unreasonably by using excessive and deadly force when it was unnecessary to prevent injury to officers or third persons—specifically, by firing five 40mm impact rounds (Yakshe) at Ms. Cohen while she was seated or otherwise non-threatening and by firing a live service-weapon round (Hannah) into Ms. Cohen's abdomen after she had placed a butter knife in her pocket upon command and was crying that she was bleeding.

76. Plaintiff was not resisting arrest or engaging in criminal or illegal conduct that would necessitate, warrant, or justify the level of force exercised by Defendants Hannah and Yakshe; she was seated on stone steps at her mother's residence, non-assaultive, and attempting to descend the stairs with both hands on the railing for balance when officers escalated their force.

77. Defendant Hannah and Defendant Yakshe were not objectively reasonable in their actions in shooting Ms. Cohen with multiple 40mm "less-lethal" rounds and a live bullet where the only alleged item was a butter knife already pocketed at officers' command, and where Ms. Cohen posed no imminent threat of death or serious physical injury to any person.

78. Ms. Cohen's catastrophic internal injuries—including surgical removal and repair of portions of her stomach and colon, prolonged hospitalization until mid-December 2024, and permanent harm—were a direct result of Defendants Hannah and Yakshe's excessive use of force.

79. Accordingly, Defendant Hannah and Defendant Yakshe have violated Ms. Cohen's Fourth Amendment right, subjecting her to excessive use of force, providing her a claim under 42 U.S.C. § 1983.

## CAUSE OF ACTION II:

**42 U.S.C § 1983: (Fourth and Fourteenth Amendments – Monell - Policy)
Against Defendant City of Phoenix and Defendant Sullivan**

80. Plaintiff incorporates by reference all previous allegations as fully set forth herein.

81. As previously explained, 42 U.S.C. § 1983 provides individuals with a cause of action to sue for violations of their constitutional rights.

82. Defendant City of Phoenix and Defendant Sullivan's acts or failure to act deprived Ms. Cohen of her constitutional rights.

83. For decades, the City of Phoenix has established and implemented policies and procedures that have consequently generated a police force that consistently acts with wanton disregard for the constitutional rights of individuals and the sanctity of human life.

84. While guidelines have allegedly been in place for years, the unwarranted, unlawful use of excessive and deadly force by PPD officers has remained a substantial issue.

85. Defendant City of Phoenix and Defendant Sullivan's transparency policy has been to release edited versions of body camera footage of officer-involved shootings, instead of releasing full unedited body camera footage.

86. This policy has created even more city-wide concern, especially among the families of victims.

14

87. Defendant City of Phoenix and Defendant Sullivan acted pursuant to their Operations Orders, which is an expressly adopted official policy of the PPD.

88. Those Orders advise officers facing resistance during situations where there is no imminent threat of serious injury or death to themselves or others, to employ a variety of de-escalation techniques before ever resorting to deadly force.

89. The PPD claims that less-lethal resources available to officers include chemical agents, restraining devices, and electronic control devices.

90. If Defendant Hannah, Defendant Yakshe, or Defendant Aviles had properly followed the Operations Orders' techniques regarding the use of physical force, less-lethal force, and, as a last resort, deadly force, Ms. Cohen's near-fatal shooting and catastrophic injuries may not have occurred.

91. The policies and procedures in place have established a police force that acted with blatant disregard to Ms. Cohen's constitutional rights and extreme indifference to the value of her life.

92. Therefore, the formal policy adopted by Defendant City of Phoenix and Defendant Sullivan led their officers to deliberately follow rules and regulations in a manner that resulted in the excessive and deadly force inflicted upon Ms. Cohen.

**CAUSE OF ACTION III:**

**42 U.S.C § 1983: (Fourth and Fourteenth Amendments – Monell – Custom and Practice)**
**Against Defendant City of Phoenix and Defendant Sullivan**

93. Plaintiff incorporates by reference all previous allegations as fully set forth herein.

94. There is a longstanding and deeply rooted legacy of the use of unlawful excessive and deadly force against the citizens of Phoenix, Arizona. Defendant City of Phoenix and Defendant Sullivan's acts or failure to act deprived Ms. Cohen of her constitutional rights.

95. Defendant City of Phoenix and Defendant Sullivan acted pursuant to their Operations Orders, which is an expressly adopted official policy or custom within the PPD.

96. The Orders advise officers facing resistance during situations where there is no imminent threat of serious injury or death to themselves or others to employ de-escalation techniques before resorting to deadly force.

97. Defendant City of Phoenix and Defendant Sullivan were well aware of the PPD's history of police chiefs claiming the enforcement of new and improved de-escalation policies.

98. These empty claims have historically been followed by officers continuing to use excessive force and unlawful deadly force at an alarming rate.

99. The PPD alleges that less-lethal resources available to officers include chemical agents, restraining devices, and electronic control devices.

100. If Defendant Hannah, Defendant Yakshe, or Defendant Aviles had properly followed the Operations Orders regarding the use of force, Ms. Cohen's catastrophic injuries would likely have been prevented.

101. It is unquestionable that there is a systemic failure with the customs and practices that Defendant City of Phoenix and Defendant Sullivan have established.

16

102.     These customs have produced a police force that acts with blatant disregard for Ms. Cohen's constitutional rights and extreme indifference to the value of her life.

103.     Said Defendants were deliberately indifferent to their duties, and thereby proximately caused Ms. Cohen's near-fatal shooting and severe injuries.

104.     The longstanding practices and customs of Defendant City of Phoenix and Defendant Sullivan directly caused the excessive and deadly force used against Ms. Cohen.

## CAUSE OF ACTION IV:

**42 U.S.C § 1983: (Fourth and Fourteenth Amendments – Monell – Failure to Train) Against Defendants City of Phoenix and Defendant Sullivan**

105.     Plaintiff incorporates by reference all previous allegations as fully set forth herein.

106.     Defendant City of Phoenix and Defendant Sullivan's acts or failure to act deprived Ms. Cohen of her constitutional rights.

107.     They had a duty to adequately train their police officers to protect members of the public.

108.     Defendant Hannah, Defendant Yakshe, Defendant Aviles, and Defendant Sullivan acted under color of state law.

109.     The Operations Orders of the PPD were not adequate to handle the usual and recurring situations officers face, including mental-health crises and encounters with vulnerable adults.

17

110. The Justice Department announced a formal investigation into the PPD in August 2021.

111. As a result, PPD received recommendations to increase the use of de-escalation techniques and decrease the employment of unwarranted deadly force.

112. Defendant City of Phoenix and Defendant Sullivan failed to employ these recommendations.

113. They were deliberately indifferent to the known or obvious consequences of failing to train their officers.

114. For example, although vehicles and officers may be equipped with less-lethal tools, over 400 officers were not trained on how to properly use them, as admitted by Defendant Sullivan.

115. Defendant City of Phoenix and Defendant Sullivan caused the deprivation of Ms. Cohen's rights by failing to train Defendant Hannah, Defendant Yakshe, and Defendant Aviles, which played a substantial part in causing the excessive and deadly force used against Ms. Cohen.

## CAUSE OF ACTION V:

**42 U.S.C § 1983: (Fourth and Fourteenth Amendments – Monell – Failure to Supervise)**
**Against Defendants City of Phoenix and Defendant Sullivan**

116. Plaintiff incorporates by reference all previous allegations as fully set forth herein.

117.    Defendant City of Phoenix and Defendant Sullivan's acts or failure to act deprived Ms. Cohen of her constitutional rights.

118.    These patterns of policies, customs, and failures to train are the direct result of their failure to oversee, manage, and supervise PPD officers.

119.    The City of Phoenix and Sullivan had a duty to adequately supervise their police officers to protect members of the public.

120.    Defendant Hannah, Defendant Yakshe, Defendant Aviles, and Defendant Sullivan acted under color of state law.

121.    The Operations Orders of the PPD were inadequate to handle the usual and recurring situations officers must deal with.

122.    Defendant City of Phoenix and Defendant Sullivan were deliberately indifferent to the known or obvious consequences of their failure to supervise.

123.    Even with their nominal statements suggesting increased use of de-escalation and decreased reliance on deadly force, they undeniably failed to supervise, ultimately causing their agents, including Defendant Hannah and Defendant Yakshe, to shoot Ms. Cohen with excessive and deadly force.

124.    Defendant City of Phoenix and Defendant Sullivan caused the deprivation of Ms. Cohen's rights by failing to supervise Defendant Hannah, Defendant Yakshe, and Defendant Aviles, which played a substantial part in causing the catastrophic injuries to Ms. Cohen.

**COUNT VI:**

19

**Violation of the Americans with Disabilities Act (Title II), 42 U.S.C. § 12132
Against Defendant City of Phoenix**

125.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

126.    Title II of the ADA provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by such entity.

127.    Plaintiff Sarah Cohen is a qualified individual with a disability: she suffers from schizophrenia and DID, which substantially limit her major life activities.

128.    The City of Phoenix, through its police department, is a public entity subject to Title II of the ADA.

129.    On November 9, 2024, Ms. Cohen attempted to access City services when Phoenix police officers responded to a call involving her outside her mother's apartment.

130.    She was entitled to receive those services in a safe, non-discriminatory manner with reasonable modifications to account for her mental illness and disability.

131.    Instead, the City of Phoenix, through its officers, denied Ms. Cohen equal access to nondiscriminatory law enforcement services by escalating to excessive force in direct response to her disability-related behaviors.

132.    Officers ignored obvious, available modifications—such as slowing the encounter, maintaining distance and cover, using calm communication, or calling crisis-

intervention officers—and instead punished Ms. Cohen's disability manifestations with 40mm impact munitions, a taser, and a live round.

133.    The failure to provide reasonable accommodations, combined with the City's longstanding customs of aggression in disability-related encounters, reflects deliberate indifference to Ms. Cohen's federally protected rights.

134.    As a direct result, she suffered catastrophic physical injuries, severe emotional trauma, displacement from her home, and long-term disability.

## STATE LAW CAUSES OF ACTION

## CAUSE OF ACTION VII:

### A.R.S. § 13-410 - Excessive Force
### Against Defendant City of Phoenix [Vicarious Liability], Defendant Hannah and Defendant Yakshe

135.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

136.    Under A.R.S. § 13-410, the use of deadly force by Defendant Hannah and Defendant Yakshe against Ms. Cohen was not justified.

137.    They could not reasonably believe that it was necessary to defend themselves or others from the use or imminent use of deadly force by Ms. Cohen, who had placed a butter knife in her pocket upon command, was seated or moving with both hands on the stair railing, and posed no imminent threat.

138.     Ms. Cohen was not attempting to escape by using a deadly weapon or committing a felony involving the use or threatened use of a deadly weapon.

139.     Defendant Hannah and Defendant Yakshe had no reason to believe that Ms. Cohen, through past or present conduct, was likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.

140.     At the time, Ms. Cohen was outside her mother's apartment and allegedly had a butter knife, which she immediately pocketed at officers' direction before they escalated force.

141.     She was then subjected to five 40mm impact rounds fired by Defendant Yakshe and a live service-weapon shot to the abdomen fired by Defendant Hannah. At no point did Ms. Cohen threaten officers with deadly force.

142.     Defendant Hannah nonetheless decided it was "reasonable" to shoot Ms. Cohen in the abdomen despite her visible injury and cries that she was bleeding.

143.     Defendant Yakshe decided and believed it was reasonable to continue firing 40mm impact rounds at Ms. Cohen despite her compliance with central commands and non-threatening posture.

144.     In addition, Defendant Yakshe was not in any zone of danger that would justify the continued barrage of impact rounds under the statute.

145.     Defendant Hannah and Defendant Yakshe had a duty to refrain from using excessive force in the circumstances presented.

22

146.    By shooting Ms. Cohen with impact munitions and a deadly live round despite the absence of any imminent threat, they breached that duty.

147.    Ms. Cohen was neither a threat of danger nor great bodily harm to either Defendant Hannah or Defendant Yakshe.

148.    She was not engaging in conduct that justified the extent of force used against her.

149.    By escalating to deadly force after failing to slow or de-escalate, and despite the availability of less-lethal alternatives and time, distance, and cover, Defendant Hannah and Defendant Yakshe clearly used excessive force.

150.    Ms. Cohen's near-fatal injuries were directly caused by their actions.

151.    None of the statutory circumstances justifying deadly force were present when they shot Ms. Cohen.

152.    Therefore, Defendant City of Phoenix is vicariously liable for the excessive force used by Defendant Hannah and Defendant Yakshe.

## CAUSE OF ACTION VIII:

### A.R.S § 12-542 - Battery
### Against Defendant City of Phoenix [Vicarious Liability], Defendant Hannah and Defendant Yakshe

153.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

154.     Under Arizona law, a battery is committed when a defendant intentionally causes a harmful or offensive contact with another person, or intentionally causes apprehension of an immediate harmful or offensive contact.

155.     Defendant Hannah and Defendant Yakshe intentionally shot Ms. Cohen—Defendant Yakshe with multiple 40mm impact rounds and Defendant Hannah with a live service-weapon round—causing harmful and offensive contact to Ms. Cohen's body.

156.     As a direct and proximate result of this harmful and offensive contact, Ms. Cohen sustained catastrophic internal injuries, underwent multiple invasive surgeries including laparotomy, bowel resection, and partial gastrectomy, endured prolonged hospitalization until mid-December 2024, and now suffers permanent harm and disability.

157.     The acts of Defendant Hannah and Defendant Yakshe constituted a battery upon Ms. Cohen in that the bodily contacts described above were intentional, unauthorized, and grossly offensive in nature.

158.     Their actions were intentional, negligent, reckless, unwarranted, and without any just cause or provocation.

159.     As a direct and proximate result of these intentional acts, Ms. Cohen was deprived of her liberty, grievously injured, and subjected to extreme physical pain and emotional suffering.

160.     Therefore, Defendant City of Phoenix is vicariously liable for the battery committed by Defendant Hannah and Defendant Yakshe against Ms. Cohen.

## CAUSE OF ACTION IX:

**Intentional Infliction of Emotional Distress**
**Against Defendant City of Phoenix [Vicarious Liability], Defendant Hannah and Defendant Yakshe**

161.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

          a.  To sue for intentional infliction of emotional distress, a claimant must show:

             i) Defendant's conduct was extreme and outrageous;

             ii) Defendant either intended or recklessly disregarded the certainty that the claimant would suffer emotional distress; and

             iii) the claimant suffered emotional distress.

162.    Defendant Hannah and Defendant Yakshe engaged in extreme and outrageous conduct by repeatedly shooting Ms. Cohen with 40mm impact munitions and then shooting her in the abdomen with a live service weapon without proper justification.

163.    They acted with the intent to violate or with complete disregard of Ms. Cohen's dignity and constitutional rights, knowing their conduct would lead Plaintiff to suffer emotional distress.

164.    Accordingly, Defendant Hannah and Defendant Yakshe are liable for intentional infliction of emotional distress.

**CAUSE OF ACTION X:**

**Negligence**
**All Defendants**

165.     Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

166.     The basic elements of actionable negligence are duty owed to a plaintiff, a breach thereof, and an injury proximately caused by the breach. Defendant City of Phoenix and the Phoenix Police Department (PPD) are vicariously liable under respondeat superior for the actions of any employee, agent, or servant of the City of Phoenix, including those of the other named Defendants in this case.

167.     The named Defendants failed to act with reasonable care under the circumstances. Defendant Hannah breached the standard of care by using excessive force, including firing a live round into Ms. Cohen's abdomen when no imminent threat of death or serious physical injury existed.

168.     Defendant Yakshe breached the standard of care by firing five 40mm impact rounds at Ms. Cohen while she was seated or otherwise non-threatening and after she had placed a butter knife in her pocket upon command.

169.      Defendant Aviles and other on-scene officers, including Vasquez Hernandez, breached the standard of care by failing to act as reasonable officers would under the circumstances, including tasing Ms. Cohen while she was already bleeding and incapacitated, which compounded the excessive force.

170. Defendant Sullivan breached his duty of care by failing to adequately train, supervise, and discipline his police officers to protect members of the public, which led directly to Ms. Cohen's catastrophic injuries.

171. As a direct and proximate result of these breaches, Ms. Cohen sustained catastrophic internal injuries, underwent multiple surgeries, endured prolonged hospitalization, and suffered severe emotional distress and economic loss.

## CAUSE OF ACTION XI:

**Negligent Hiring, Supervision, Retention and/or Training
Against Defendant City of Phoenix and Defendant Sullivan**

172. Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

173. Under Arizona law, an employer may be held directly liable for negligent hiring, retaining, and supervision of their employees if (i) the employer knew or should have known the risk of hiring, supervising, and training a particular employee, and (ii) the employer's negligence proximately caused the plaintiff's injury.

174. The PPD is consistently ranked among the highest policing agencies in the nation for use of deadly force by officers.

175. Based on these troubling numbers, the Justice Department announced a formal investigation into the PPD in August 2021.

176.    Defendants City of Phoenix and Sullivan knew their authorized policies and procedures were resulting in the unwarranted use of excessive and deadly force against Arizona citizens.

177.    In the months leading up to Ms. Cohen's November 9, 2024 shooting, PPD publicly released multiple critical-incident briefings revealing separate officer-involved shootings, underscoring the Department's ongoing failure to curb excessive force.

178.    These events confirm the City's and Sullivan's knowledge of systemic failure.

179.    The hiring, supervision, and training policies in place established a police force that acts with blatant disregard for constitutional rights and extreme indifference to the value of human life.

180.    The failure to hire, supervise, and train Defendant Hannah, Defendant Yakshe, and other on-scene officers (including Aviles and Vasquez Hernandez) was the proximate cause of Ms. Cohen's catastrophic injuries and severe emotional distress.

### CAUSE OF ACTION XII:

**Gross Negligence (Per Se)**
**Against All Defendants**

181.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

182.    Under Arizona law, gross negligence is a heightened degree of negligence representing an extreme departure from the ordinary standard of care.

183.    The Defendants had a duty to act with reasonable care towards Ms. Cohen.

184.    They acted willfully and recklessly with deliberate disregard of that duty.

185.    Defendants breached the standard of care by failing to act as reasonable supervisors and/or officers would under the circumstances, which led to the excessive force used by Defendant Hannah and Defendant Yakshe and the compounding use of force by other on-scene officers.

186.    Under the totality of the circumstances, Defendants acted with extreme disregard of the ordinary standard of care by firing multiple 40mm impact rounds, deploying a taser against a bleeding, incapacitated woman, and firing a live round into Ms. Cohen's abdomen after she had pocketed a butter knife upon command and posed no imminent threat.

187.    Defendants' extreme departure from the ordinary standard of care resulted in Ms. Cohen's catastrophic internal injuries, multiple surgeries, prolonged hospitalization, permanent harm, and severe emotional distress.

## COUNT XIII:

**Violation of Arizona's Vulnerable Adult Statute (A.R.S. § 46-451 et seq.)
Against Defendant City of Phoenix and Individual Officers**

188.    Plaintiff incorporates by reference all previous allegations as though fully set forth herein.

189. Plaintiff Sarah Cohen is diagnosed with schizophrenia and dissociative identity disorder ("DID"), conditions that substantially limit her ability to reason, perceive danger, and protect herself from harm.

190. These diagnoses, coupled with her history of trauma and her ongoing ACT team treatment, render her a vulnerable adult under Arizona law.

191. On November 9, 2024, Defendants Hannah, Yakshe, Aviles, Vasquez, Hernandez, and other PPD officers assumed complete control over Ms. Cohen's person by surrounding her, issuing commands, and seizing her while she was outside her mother's apartment. At that moment, they owed her a duty of care as a vulnerable adult under their control.

192. Defendants abused and neglected Ms. Cohen by escalating force without justification, firing multiple 40mm impact munitions at her body, tasing her while she was already bleeding and incapacitated, and ultimately shooting her in the abdomen with a live service weapon.

193. They further neglected her by failing to intervene when observing their colleagues' unconstitutional use of force, and by delaying timely medical aid despite obvious catastrophic injuries.

194. As a direct and proximate result of this abuse and neglect, Ms. Cohen suffered severe physical harm, emotional trauma, and economic damages, including prolonged hospitalization, permanent internal injuries, displacement from her home, and ongoing disability.

195.    Defendants' actions violated A.R.S. § 46-451 et seq., rendering both the City of Phoenix and the individual officers liable for damages.

**PRAYER FOR RELIEF**

a.    Compensatory damages in an amount to be proven at trial (including past and future medical expenses, pain and suffering, loss of enjoyment of life, lost earning capacity, and out-of-pocket losses);

b.    Punitive damages against the individual Defendants to deter and punish willful and reckless misconduct;

c.    Declaratory relief that Defendants' policies, practices, and conduct violated Plaintiff's constitutional and statutory rights;

d.    Injunctive relief requiring the City/PPD to adopt, implement, and enforce evidence-based policies, training, supervision, and accountability systems concerning de-escalation, crisis intervention, duty to intervene, use of 40mm munitions and CEWs, and accommodations for individuals with behavioral disabilities;

e.    Attorneys' fees and costs under 42 U.S.C. § 1988, the ADA, the Rehabilitation Act, and Arizona law;

f.    Pre- and post-judgment interest as permitted by law;

g.    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

**RESPECTFULLY SUBMITTED** this September 13, 2025.

/s/ Quacy L Smith

Quacy L Smith, Esq.

*Attorney for Plaintiff*